## JAMES B. LILLY, Appellant, v. HAYNES CO-OPERATIVE COAL MINING COMPANY, a Corporation, Respondent.

(196 N. W. 556.)

**Contracts — where so stipulated approval of attorney essential. unless fraudulently withheld.**

1. Where one of the parties to a contract stipulates for the approval of his attorney, in the absence of fraud in withholding the approval, the contract, made conditional on such approval, is not effective or operative unless it be obtained.

**Evidence — parol evidence admissible to show condition precedent.**

2. It may be shown by parol evidence that a contract was delivered upon a condition precedent.

**Master and servant — failure to comply with compensation act not available to one not an employee; coal miner held "employee" within compensation act and not independent contractor.**

3. A person who has failed to comply with the Workmen's Compensation Law is not liable for injuries, whether received through accident or the negligence of another, unless the person injured be an employee; for reasons stated in the opinion, it is *held* that there is substantial evidence in the record from which the jury could find that the plaintiff was an employee of the defendant at the time of the injury.

---

Note.—(2) *Admissibility of parol evidence to show that contract was delivered upon condition,* see note in 36 L.R.A.(N.S.) 1147; 11 A.L.R. 1174; 10 R. C. L. 1053; 2 R. C. L. Supp. 1146.

(3) *Who are employees within meaning of Compensation Statutes,* see notes in L.R.A.1916A, 115, 246; L.R.A.1917D, 145; L.R.A.1918F, 201; 28 R. C. L. 762; 3 R. C. L. Supp. 1593; 4 R. C. L. Supp. 1846.

(4) *What constitutes an "accident" within meaning of Workmen's Compensation Acts,* see notes in L.R.A.1917D, 110, 129; L.R.A.1918F, 869; 19 A.L.R. 95; 28 A.L.R. 284; 28 R. C. L. pp. 736, 816; 4 R. C. L. Supp. pp. 1842, 1865; 5 R. C. L. Supp. 1576.

**Master and servant — employer failing to comply with compensation act liable irrespective of fault.**

4. When an employer has failed to comply with the Workmen's Compensation Law, the employer is liable to an injured employee within the act, where the damages are suffered by reason of an injury sustained in the course of the employment, without regard to questions of fault.

Opinion filed December 8, 1923.   Rehearing denied December 18, 1923.

Contracts, 13 C. J. § 131 p. 307 n. 8; § 703 p. 634 n. 99; § 771 p. 679 n. 48, 50.   Evidence, 22 C. J. § 1540 p. 1150 n. 3.   Workmen's Compensation Acts, C. J. § 42 p. 50 n. 63; § 66 p. 76 n. 94; § 157 p. 136 n. 49.

Appeal from the District Court of Adams County, North Dakota, *Pugh,* J.

Reversed.

*Jacobsen & Murray,* for appellant.

"It is not sufficient to warrant such judgment that the evidence was such that the trial court ought to have granted either a motion for a directed verdict, or a new trial on the ground of insufficiency of the evidence to sustain the verdict, but it must, also, appear that there is no reasonable probability that the defects in or objections to the proof may be remedied upon another trial." First State Bank v. Kelley, 30 N. D. 84.

"Doubts should in all cases be resolved in favor of the submission of the case to the jury. It is only when the court can find no evidence, which in its deliberate and ultimate judgment is entitled to be weighed that the jury should be instructed in terms that there is no evidence to support the burden of proof which rests upon the party." 38 Cyc. 1567, ¶ B.

"The rule is well settled that questions as to which there is a conflict must be submitted to the jury." 38 Cyc. 1536, ¶ 2; 16 N. D. 446; 6 N. Dak. 353.

"When the evidence offered by a plaintiff is conflicting, and certain portions of his own testimony are in conflict with other portions thereof, such evidence should be submitted to the jury, and it is error to sustain a demurrer thereto." Smith v. Schriver, 138 Pac. 586.

The evidence has already been held sufficient by this court to avoid

the stipulation dismissing the action. Lilly v. Haynes Coal Co. 188 N. W. 38.

"We have examined the writing and the testimony in regard to it, with much care, and, although we should not have reached the conclusions which the jury did in regard to the alleged fraud, we cannot say that the finding was so far unsupported by the evidence that the verdict should have been set aside." Burlington Lumber Co. v. Evans Lumber Co. 69 N. W. 558.

"The tendency of modern decisions is not to extend but to restrict the rule requiring diligence, and similar rules, . . . and to condemn the falsehood of the fraud feasor rather than the credulity of his victim." 25 C. J. 1144.

"We are of the opinion that the test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent." Tuttle v. Embury Martin Lumber Co. (Mich.) 158 N. W. 875; Green County v. Shertzer (Ind.) 127 N. W. 843.

*P. D. Norton* and *C. F. Kelsch,* for respondent.

"An independent contractor is one who exercises an independent employment, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer, except as to the result of the work." Powell v. Construction Co. 88 Tenn. 692, 13 N. W. 691.

"An independent contractor is one who rendered service in course of an occupation and represents the will of his employer only as to the result of his work and not as to the means whereby it is accomplished and is usually paid by the job." Bibb v. Norfolk & W. R. Co. 87 Va. 711, 14 S. E. 163; Smith v. Simmons, 103 Pa. 32, 49 Am. Rep. 113; 26 Cyc. 966; Frances v. Johnson, 127 Iowa, 391, 101 N. W. 78; Hughbanks v. Boston Ins. Co. 92 Iowa, 267, 60 N. W. 640.

"Where the evidence discloses no connection between the injury and the negligence charged excepting a bare possibility that the former resulted from the latter, there is nothing for the jury when it is also possible the injury may be due to other causes." 22 R. C. L. p. 149, § 32.

"The court should direct a verdict for defendant in an action to

recover damages for personal injuries where the facts are undisputed, and as a matter of law, the alleged negligence was not the proximate cause of the accident." Teis v. Smuggler Min. Co. 15 L.R.A.(N.S.) 893, 158 Fed. 260.

"A defect in a street because of which a pedestrian receives a slight injury cannot be found to be the proximate cause of sarcoma, necessitating the amputation of his leg since such result could not have been foreseen." Allison v. Fredericksburg, 112 Va. 243, 48 L.R.A. (N.S.) 93, 71 S. E. 525.

"Where there was a predisposition to disease the fact of its development after a personal injury will not be considered as an element of damage where evidence leaves it doubtful whether its development was in any manner caused by the injury." 22 R. C. L. p. 153, § 36.

JOHNSON, J. This is an appeal from a judgment of the district court of Adams county. The cause was tried to a jury, resulting in a verdict for the plaintiff; subsequently, the defendant moved for a new trial or for judgment notwithstanding the verdict; the court granted the motion for judgment notwithstanding the verdict. Plaintiff appeals.

Plaintiff alleges that the defendant is a foreign corporation engaged in mining coal in Adams county, North Dakota; that the plaintiff was employed by the defendant to work in its mine in this state, commencing in the month of October, 1919, and that the plaintiff continued in such employment until he was injured; that it was the duty of the defendant to provide a reasonably safe place in which and suitable tools with which to work; that the plaintiff was employed to dig coal and to assist the mule driver in hauling cars of coal from the coal mine and to assist in replacing derailed cars; it is further alleged that the defendant failed to comply with the coal mine inspection laws of the state and with chapter 162, Session Laws of 1919, known as the Workmen's Compensation Law; that the place of work was unsafe, the tools and equipment inadequate and that the foreman of the mine was not licensed as required by the mining laws of this state; that on or about the 20th of February, 1920, while engaged in the performance of his duties, and while the plaintiff was engaged in replacing a derailed car, the plaintiff was injured, without fault of his own, because

of such defective equipment, appliances and tools and that his leg was broken, necessitating the subsequent amputation thereof; that such injury was caused by the negligence of the defendant and its servants and its principals. It is then alleged that the plaintiff suffered damages because of the negligence and injuries aforesaid.

The defendant answered, admitting the corporate character of the defendant. There is both a general and specific denial of all the material allegations of the complaint. The defendant alleges that, subsequent to the injury and on or about November 14, 1921, the plaintiff compromised and settled his claim with the defendant and received a sum of money in full satisfaction thereof. It is then alleged that the defendant complied with the terms of the compromise agreement and paid the plaintiff the sum of $375 pursuant thereto; that the plaintiff accepted such payment and has at all times retained the same. It is further alleged that the plaintiff, on November 14, 1921, for a valuable consideration, with full knowledge of the facts, entered into a stipulation to dismiss the action. The defendant attaches to his answer, as exhibits, copies of the compromise agreement and of the stipulation to dismiss.

The defendant makes three principal contentions: First, it relies on the compromise settlement set up in the answer; second, it contends that the plaintiff was an independent contractor and not a servant of the defendant; and third, that plaintiff was not injured in the course of the employment, that is to say, the defendant contends that the evidence conclusively shows that the plaintiff's leg was not broken in the mine and while the plaintiff was in the employ of the defendant, but after such employment ceased and at his brother's home. We shall discuss these propositions in the order presented.

The trial court, according to the memorandum decision, ordered a judgment notwithstanding the verdict on the sole ground that the compromise settlement was conclusive and binding upon the plaintiff. The evidence shows that the plaintiff took steps to rescind the settlement promptly after it was made, and, if he had the right to rescind, it seems not to be questioned that he rescinded promptly and properly tendered a return of the consideration received.

The facts are substantially as follows: The plaintiff testifies that he was employed in the mine operated by the defendant in Adams

county: that he was paid by the ton and furnished his own tools and explosives necessary in the mining operations: that there was a mine superintendent and a pit boss; that each miner, including the plaintiff, had a room of his own in which he mined coal at a stipulated rate per ton; that he laid his own track and had charge of this room; that in this room he "shot" the coal, that is to say, placed the explosives and set them off in order to break up or loosen the coal and load it on the cars; that the mining company provided a driver who hauled the cars out of the rooms and the mine. The mine superintendent, testifying as a witness for the defendant, testified substantially to the foregoing facts. He stated likewise that the room was not to be driven any wider than sixteen feet. The testimony of plaintiff shows that the pit boss in the mine gave instructions to the plaintiff and his brother to assist each other to get derailed cars back on the track. It further appears that the company furnished timbers or blocks and pry poles for this purpose; the foreman instructed them how to use the tools. Just prior to the accident, a man by the name of Chalmers was hauling out a loaded car when it left the track. Chalmers then asked the plaintiff and his brother to help him get the car back on the rails. Plaintiff acceded to this request, using the implements furnished for that purpose by the company. He used a heavy timber or block about twelve feet long. Plaintiff was pressing down on the end of the timber when Chalmers ordered the mule to move, with the result that the timber fell and the injury occurred. Plaintiff's brother testifies that the timber fell on his brother's leg and knocked him down and that he lay with the timber across his leg above the knee. He then says the timber was lifted off and plaintiff, according to the testimony of this witness, screamed and called for help. No other miner, it seems, heard the screams or knew of the injury. This happened, according to the testimony of the plaintiff, between the 27th of February and the first of March, 1920. Chalmers, the mule driver, testifies, in substance, that he recalls the incident, but that the plaintiff did not seem to be hurt seriously; that he rubbed his leg a little, but did not scream and that he was not pinned under the timber. This witness says further that the plaintiff, after this incident happened, mined coal all the rest of the day and walked out of the mine that night. Another witness testifies that two loads were hauled from his room apparently after the

alleged accident and on the same day. It seems that the plaintiff was taken from the mine to a hospital at Hettinger on March 4, where he was treated by Dr. Mordoff until the 17th of March, for a pleuritic infection; before that, the plaintiff had been treated at the mine for digestive disturbances and for a cold and pleurisy from February 24 to March 3, 1920, nearly every day. The plaintiff, according to the doctor, did not complain about his leg from the 24th of February to the 17th of March, nor did he complain while he was at the hospital to anyone except his brother with respect to his leg; the doctor testifies that the plaintiff walked to his office on March 14, a distance of one and one-half blocks and that his manner of walking was not unusual; according to the testimony of the physician, the plaintiff never asked, during this period, that his leg be given attention. The testimony further tends to show that the plaintiff went from Hettinger to the coal mine on March 17, spent the night there playing cards with other miners, and the next morning went to his brother's home. At least two witnesses testify that when plaintiff was in the mine on this occasion, he walked about the same as he had walked prior to the date of the alleged injury. This is denied by plaintiff. On the 31st of March, 1920, Dr. Mordoff treated the plaintiff at his brother's home for pains in the right leg. This appears to be the first time that plaintiff complained of pains in the leg, according to the doctor's testimony. On April 3, the same doctor was called to the home of plaintiff's brother to treat plaintiff; on April 4, a toxic condition had developed; on April 6, plaintiff was taken from his brother's home to Mrs. Morey's Hospital to have his right leg treated. The doctor had been treating his right leg from March 31 to April 6; on April 15, the doctor made an incision in the leg, whereupon some drainage ensued; from April 6 to April 19, plaintiff remained in the hospital, at times in delirium. The doctor testifies that the patient was so active in the hospital that a man had to be employed to restrain him; that he walked about freely, without a cane, using the leg without difficulty and was able to rest the weight of the body thereon. It is clear from the doctor's testimony that plaintiff was, during this period, in great pain due to the condition of his leg and was irrational at times to such an extent as to require a strong male attendant. The doctor says, however, that there was no evidence of a fractured leg. On April 19, plaintiff was taken back to

his brother's home; on April 29, the doctor was again called to treat plaintiff at his brother's home, when the doctor found symptoms of shock, due to a fractured leg. A practical nurse, who was present when the doctor attended plaintiff on April 29, testifies that she saw a bone sticking out of the leg, indicating a break, and that this was on the right leg near the knee. The leg was then strapped to a board and the plaintiff was taken, on April 30, to Aberdeen, South Dakota, where the leg was removed. Dr. Murdy, who performed the operation, testifies, in substance, that he found a pathologic fracture of a very much diseased bone. He says that such a fracture may occur even as a result of ordinary walking, where a quantity of the bone substance has been destroyed by tuberculosis or other diseases, which he enumerates. See Peterson, Haynes & Webster, Legal Med. & Tox. pp. 386, 387. He says that he found the bone in a tubercular condition; that the fleshy part had been separated from the bone; that the bone was honeycombed and porous and that very little was left of it; he says that he found a case of advance tuberculosis of the bone associated with pus germs. This doctor also testifies that plaintiff told him that he broke his leg at his brother's home near Hettinger, on April 29, 1920. From the foregoing and other portions of the testimony, the defendant contends that the evidence conclusively shows that the leg was broken, not in the mine, but at the home of the plaintiff's brother and that, therefore, there is no liability. The testimony, of course, is disputed by plaintiff and his brother in all substantial particulars.

The plaintiff's testimony, very briefly summarized, tends to show that he was severely injured in the mine and, of course, he claims that there his leg was broken. He states he never used the leg thereafter; the plaintiff, upon the oral argument, contends, and his contention on this point has some support in the expert testimony of medical witnesses, that the tubercular condition found by Dr. Murdy of Aberdeen might have resulted from the injury received in the mine. Dr. Murdy testifies that 90 per cent of people have tubercular germs in their systems, though fortunately, in many cases, inactive; that an injury may, under certain extraordinary circumstances, render such germs active. One of the expert witnesses for the plaintiff gave it as his opinion, from an examination of an X-ray photograph, that there was no tuberculosis in the bone at the time the photograph was taken, namely, on the 30th

of April, which was also the date of the amputation. On this point the expert testimony is in hopeless conflict.

Special interrogatories were submitted to the jury. The first interrogatory was as follows: "Was the plaintiff's right leg broken and crushed on or about February 20, 1920, as alleged in the complaint? A. Crushed." Then followed an interrogatory as to whether the leg was broken at the home of plaintiff's brother on April 29, 1920, which was answered "No." The third interrogatory was as follows: "Was the femur of the right leg of the plaintiff, Lilly, diseased with tubercular germs on April 30, 1920, when the bone was examined by Dr. Murdy and Dr. Murdoff at St. Luke's Hospital at Aberdeen, South Dakota?" A. "Yes." Interrogatory No. 4: "Was the tubercular condition of the femur of the right leg of plaintiff one of the causes resulting in the amputation of the right leg of the plaintiff on April 30, 1920?" A. "Yes." Other questions were submitted, one as to whether the plaintiff was induced through fraud, undue influence, or misrepresentation, to enter into the compromise agreement, Exhibits 9, 11, and 12, which the jury answered in the affirmative. To another question as to whether, on November 14, 1920, the plaintiff was so intoxicated "that he did not know and understand the business he then transacted," the jury answered "No."

The question with reference to the compromise settlement was thoroughly considered by the trial court. Briefly stated, the facts are as follows: The defendant came to Haynes with one Sneckloth, who transported him in his car; he there fell in with two strangers who proceeded to refresh him with something from a bottle, which the plaintiff says was intoxicating; he thereafter saw one Bigham who was connected with a bank at Haynes. He likewise was hospitable and entertained plaintiff with liquid refreshments. Bigham had some conversation with plaintiff with reference to his case which was then pending. As a result of the discussion, the plaintiff signed a settlement or release, dated November 14, 1921. This he acknowledged before a notary public (Bigham) and in it he avers that for a consideration of $200, receipt of which is acknowledged, and for the further consideration of $175, to be paid to a hospital, the plaintiff has released in full his claim against the defendant. On the same day, the plaintiff signed a stipulation dismissing his action against the defendant. Plaintiff

testifies that he was so intoxicated that he did not read or understand the transaction that took place; that he did not read the paper nor was he sure that it was read to him. We are satisfied upon the whole record, however, that the plaintiff not only read the paper, but that it was read to him and the findings of the jury that he was not so intoxicated as to be unable to understand the nature of the transaction is undoubtedly correct. The plaintiff however testifies in substance that it was agreed that the agreement of release was to be submitted to his attorney and that if it was not satisfactory to him, the agreement was not to be binding and effective; it was "not to be worth the paper it was wrote on." It appears that when the agreement was submitted to the attorney for the plaintiff, the same was immediately rescinded as not satisfactory. The trial court, in a very carefully prepared memorandum decision, refers to this part of the testimony as not satisfactory in view of the fact that the plaintiff was fully able to read and understand the nature of the transaction in which he was engaged. It should be noted, however, that the plaintiff testifies that the witness Sneckloth, who called for him at his farm and took him to Haynes on the day of the settlement, told him, in substance, that he, Sneckloth, did not believe that the plaintiff had much of a case and that it was pretty hard to maintain it against a corporation in view of its powerful influence. It is not unreasonable that plaintiff desired to consult his attorney upon the whole transaction before the agreement signed by him should become operative. It also appears that the agreement had to be submitted to the officers of the defendant before it became binding and that some blanks were left therein for them to fill; plaintiff claims these blanks were not filled according to the agreement. We think there is sufficient evidence in the record to support a finding by the jury that the compromise settlement was executed upon a condition precedent within the provisions of § 5771, Comp. Laws 1913. That section defines a condition precedent as one which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed. It is well settled that a promise may be conditional on the act or the will of a third person. It has frequently been held that where one of the parties stipulates for the approval of his attorney, the contract made conditional on such approval is not effective or operative unless the approval be obtained. Glidden v. Massachusetts

Hospital L. Ins. Co. 187 Mass. 538, 73 N. E. 538; Roberts v. Atwood, — Tex. Civ. App. —, 188 S. W. 1014; First Nat. Bank v. Clay, 74 Okla. 112, 177 Pac. 115; 13 C. J. 634, 679. "A condition precedent calls for the performance of some act or the happening of some event after the terms of the condition have been agreed upon before the contract shall take effect. That is to say, the contract is made in form, but does not become operative as a contract until some future specified act is performed or some subsequent event transpires." Redman v. Ætna Ins. Co. 49 Wis. 431, 4 N. W. 595. That a contract is delivered upon a condition precedent may be shown by parol evidence and that such evidence does not vary or contradict the terms of the written instrument, appears to be well established. Cavanagh v. Iowa Beer Co. 136 Iowa, 236, 113 N. W. 857; Story, Contr. 5th ed. 33. See also Sunshine Cloak & Suit Co. v. Roquette Bros. 30 N. D. 143, L.R.A. 1916E, 932, 152 N. W. 359.

It is next contended that the plaintiff was an independent contractor. With this contention we cannot agree. The general rule we believe is correctly stated by the supreme court of Minnesota in State ex rel. Virginia & R. L. Co. v. District Ct. 128 Minn. 43, 150 N. W. 212, 7 N. C. C. A. 1076, as follows: ". . . one person is not liable for injuries caused by the negligence of another, unless such person possessed the power to control the acts of the other in respect to the transaction out of which the injury arose, and that the test for determining whether one person is an employee of another, within the rule making the employer responsible for the negligence of his employee, is whether the alleged employer possessed such power of control." We think it clear from the record that the defendant had the right to discharge the plaintiff at any time; that if the plaintiff was mining coal in a manner to cause waste and loss to the defendant, the defendant had the undoubted right to discharge him; there was a pit boss and a mine superintendent who apparently had some duties of supervision and inspection in the mine. We are satisfied that there is evidence in the record from which the jury could properly find that the defendant had control over the plaintiff within the rule stated, and, therefore, found correctly that the plaintiff was an employee of the defendant. A contrary rule would probably leave the vast majority of the coal miners

of the state outside the purview of the compensation act, contrary to its expressed purpose.

It is next contended by the defendant that the plaintiff was not injured in the course of the employment and that there was no negligence shown on the part of the defendant. This court held, in the case of Fahler v. Minot, 49 N. D. 960, 194 N. W. 695, that an employer who has not complied with the Workmen's Compensation Law, as was the fact here, is liable to an injured employee within the act, where the damages were suffered by reason of injuries sustained in the course of the employment and regardless of questions of fault. The only question, therefore, under this branch of the case, is whether the injuries were received within the course of the employment.

What was the proximate cause of the injury which necessitated the amputation of the leg? If the injury to the leg, which was received in the mine and in the course of the employment, quickened into activity dormant or inactive tuberculosis germs, and if, as a result of the ravages of that disease thus brought on, it became necessary to amputate the leg, the injury is not the consequence of a subjective or idiopathic condition, but the accident in the mine accelerated or aggravated a preexisting disease so as to result in a compensable injury within the letter and the spirit of the Workmen's Compensation Act. George L. Eastman Co. v. Industrial Acci. Commission, 186 Cal. 587, 200 Pac. 20. See also Puritan Bed Spring Co. v. Wolf, 68 Ind. App. 330, 120 N. E. 417.

The evidence is conflicting and very unsatisfactory. There is much testimony that supports respondent's contention that the leg was not broken in the mine, but was broken at the home of the plaintiff's brother several miles distant. The evidence, however, does show beyond dispute some injury to the plaintiff's leg while in the mine and while actually engaged in the performance of his work as a miner. The jury found that it was "crushed" there. We are not prepared to say as a matter of law that there is not sufficient evidence from which the jury could find that the plaintiff was injured in the mine and that such injuries were the proximate cause of the amputation of plaintiff's leg, whether the leg was broken there or only crushed, as expressly found by the jury. In view of the disposition we are making of this lawsuit,

we deem it unnecessary to discuss this matter further. In any event, the plaintiff, having offered evidence sufficient to support a finding that he was employed by the defendant and injured in the course of the employment, was entitled to recover a verdict because of such injury and without regard to questions of fault. As has been pointed out, there is testimony in the record from which the jury might have found, even if the leg was not broken in the mine, that the injury received by the plaintiff in the course of his employment as a miner caused latent tubercular germs to become active, with the ultimate result that amputation became necessary.

The case seems to have been tried on the theory that the leg was broken in the mine the latter part of February, 1920, and not at the home of the plaintiff's brother on the 29th of April following. As has been pointed out, the evidence on this point is hopelessly conflicting and in some respects the testimony of the plaintiff himself and his witness is contradictory. This evidently was the view of the jury because they evaded the question as to whether the leg was broken in the mine by answering that it had been crushed. Yet, it is undisputed that the leg was in fact broken *somewhere*. The testimony of the physicians with respect to the probability of tuberculosis of the bone resulting from the injuries sustained in the mine even if the bone was not broken at that time is far from satisfactory. Dr. Murdy, the physician who amputated the leg, testifies that there are inactive tuberculosis germs in 90 per cent of individuals and that "under certain extraordinary circumstances" an injury or fracture may be a predisposing factor or may set those germs in motion. Some of the other experts who testified for the plaintiff testify that such an injury or fracture, with lowered vitality and consequently lowered resistance, may render active germs that will bring about pus and perhaps other pathological conditions. We do not believe that this aspect of the record was brought to the attention of the trial court upon the argument of the motion for judgment notwithstanding the verdict or for a new trial. Indeed, there is no reference made to this feature of the case in the memorandum opinion of the trial court. On the whole record, and particularly in view of the doubts entertained by the trial court as to the sufficiency of the evidence upon some aspects of this case to sustain the verdict, we

think the interests of justice will be served by a new trial, rather than a reinstatement of the verdict.

The judgment of the trial court is reversed and a new trial ordered.

BRONSON, Ch. J., and CHRISTIANSON, BIRDZELL, and NUESSLE, JJ., concur.