Dave **KRUGER** and **Marietta Kruger,** Plaintiffs and Appellants,

v.

John G. **SOREIDE** and **Dorothy L. Soreide,** Defendants and Appellees,

and

**Don Pierce and Bernard Engesser,** Defendants, Appellees, and Cross-Appellants.

**Civ. No. 9242.**

Supreme Court of North Dakota.

Nov. 5, 1976.

---

3. Copyrights, patents, and trade names may be protected by law by following the appropriate procedures.

Freed, Dynes, Malloy & Reichert, Dickinson, for plaintiffs and appellants; argued by George T. Dynes, Dickinson.

Stuart & Jaynes, Hettinger, and John A. Amundson, Bowman, for defendants and appellees John G. Soreide and Dorothy L. Soreide; argued by Jerome L. Jaynes, Hettinger.

T. L. Secrest, Hettinger, and Elmer V. Morland, Bowman, for defendants, appellees and cross-appellants Don Pierce and Bernard Engesser; argued by Elmer V. Morland, Bowman.

SAND, Justice.

David Kruger and Marietta Kruger, husband and wife, brought an action against John Soreide and Dorothy Soreide, husband and wife, and the Bowman Real Estate (Bernard Engesser and Don Pierce, d. b. a. Bowman Real Estate) for damages arising out of an alleged breach of purchase contract for ranch land. Bowman Real Estate counterclaimed for commission allegedly due on the second listing of the same property. A judgment of dismissal was entered on March 3, 1976, on all issues, from which the Krugers appealed, and from which Bowman Real Estate cross-appealed.

The Krugers owned a ranch consisting of approximately 3,000 acres in Bowman County which they decided to offer for sale. They entered into a listing agreement with the Bowman Real Estate Company. John and Dorothy Soreide became interested in the property, and on December 5, 1974, entered into a purchase contract prepared by Bowman Real Estate with the Krugers for the amount of $300,000. The Soreides were concerned about financing the purchase and expressed reservations about mortgaging certain portions of the land they owned. Bowman Real Estate inserted the following provision in the contract: "This sale to be subject to buyer receiving Federal Land Bank financing." The contract was signed by Dave Kruger, Marietta Kruger, John Soreide and Dorothy Soreide. On that date Dave Kruger requested until December 10 to think over the transaction. Within the next several days, and before December 10, Kruger contacted Bowman Real Estate and asked that they try to obtain an additional $10,000 on the contract, which they did. Soreide agreed to pay an additional $8,000, and an agreement to this effect was signed by Dave Kruger and John Soreide, but not by Mrs. Kruger nor Mrs. Soreide.

The Soreides applied to the Federal Land Bank for financing. The mortgage and proposed financing arrangements included all of the Kruger ranch and most of the Soreide property, including the farm headquarters.[1] The North Half of Section 5, and a ten-acre tract on which the Soreides lived was not included. The application for financing was processed by the Federal Land Bank and received preliminary approval. However, Mr. and Mrs. Soreide refused to go through with the loan, giving as one of the reasons the inclusion of the farm headquarters in the mortgage. The Soreides testified that prior to signing the contract to purchase they informed Bow-

---

1. Throughout the trial, various terms were used to refer to the approximately 40-acre tract on Section 32 on which a silo, feed lots, and other farm buildings were located. Among the terms used were "homestead," "home place," "farmstead," and "headquarters." The Soreides' personal residence was not located on this section, but was situated on a smaller tract not contiguous to the rest of the farm. The trial judge, in his findings of fact and conclusions of law, referred to the 40-acre tract of farm buildings as the "homestead." In Findings of Fact III, the trial judge defined "homestead" by stating that "The homestead portion is approximately 40 acres in Section 32–132–102, Bowman County, North Dakota," thus making it clear that the term "headquarters" did not refer to the Soreides' personal residence, but rather to the 40-acre tract containing the farm buildings, which will be referred to hereinafter in this opinion as the "headquarters."

man Real Estate of their decision to exclude the headquarters from any security mortgage. They also testified that the Federal Land Bank was informed at the time of the initial appraisal of their decision not to mortgage the headquarters.

Subsequent to Soreides' refusal to sign the mortgage, the loan application was canceled, and Bowman Real Estate returned the earnest money of $5,000 to the Soreides. Neither Soreides nor Bowman Real Estate were aware that the North Half of Section 5 had been omitted from the mortgage until depositions were taken in preparation for trial of this case in the district court. According to testimony at trial, no buildings were located on the North Half of Section 5. Duane Hanson of the Federal Land Bank testified that it was preferable to include the headquarters in the mortgage, so that in the event of foreclosure the property would be more salable.

Even though the Krugers were disappointed with the manner in which Bowman Real Estate conducted the transaction with the Soreides they nevertheless relisted their ranch with Bowman Real Estate, and continued to make demands on the Soreides to comply with the original agreement. Bowman Real Estate was unable to find other buyers for the amount for which the property was to be sold to the Soreides. Ultimately, Krugers sold the property directly to two Montana men, Uttke and Ketterling, for $250,000. This action followed, wherein the Krugers sued Soreides and Bowman Real Estate for expenses and for $58,000 in damages due to reduction in purchase price. Bowman Real Estate counterclaimed, contending that they were entitled to the commission as set out in the second listing contract dated 30 June 1975.

The basis of Krugers' claim against Soreides is breach of the contract to purchase and the resultant loss in purchase price. Accordingly, we must decide the preliminary question whether or not the purchase agreement of December 5, 1974, between Krugers and Soreides was a binding contract.

Crucial to this determination is the significance and interpretation given to the language in the purchase contract, "This sale to be subject to buyer receiving Federal Land Bank financing." The trial court held that this language was ambiguous, with which we agree. An ambiguity exists when good arguments can be made for either of several contrary positions as to the meaning of a term, and the determination whether an ambiguity exists is a question of law. *Grove v. Charbonneau Buick-Pontiac, Inc.,* 240 N.W.2d 853, 861 (N.D. 1976); *In re Estate of Johnson,* 214 N.W.2d 112 (N.D.1973). The language, "This sale to be subject to buyer receiving Federal Land Bank financing" could be interpreted to mean financing under whatever terms the Federal Land Bank cared to impose; or financing under the terms currently in use by the Federal Land Bank; or financing within what the Soreides felt was their ability. Because the clause was ambiguous, it was proper for the court to refer to the circumstances under which it was made and the matters to which it related in order to construe the terms. *Stuart v. Secrest,* 170 N.W.2d 878 (N.D.1969); § 9–07–12, North Dakota Century Code.

In construing the ambiguous phrase, the trial court referred to oral testimony of the parties concerning the circumstances surrounding the December 5 agreement. The trial court found as a fact that before the agreement was entered into, it was orally agreed between the defendants Don Pierce and Bernard Engesser of Bowman Real Estate and defendants John and Dorothy Soreide that the headquarters portion of Soreides' land would not be included in the proposed mortgage. The trial court also found that defendants John and Dorothy Soreide informed the agents of the Federal Land Bank at the time of the appraisal that the headquarters was not to be included in the proposed mortgage. From these facts the trial court concluded that the parties understood and agreed that the financing clause was meant to include the condition that Federal Land Bank financing would not require the Soreides to mortgage their farm headquarters and that such

agreement was reached prior to the signing of the December 5 purchase contract.

We have examined the record and we find that there is substantial evidence to support those findings of fact made by the trial court, thus we cannot conclude that such findings were clearly erroneous. We agree with the trial court's conclusion as to the meaning of the financing clause.

■ The agreement having been conditioned upon obtaining Federal Land Bank financing in accordance with the understanding reached, a condition precedent to performance of the contract was created. A condition precedent is one which must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies. Williston on Contracts, Third Edition § 666A; 3A Corbin, Contracts, § 628 (1960); Restatement of Contracts § 250 (1932).

■ North Dakota law recognizes that a condition precedent may be a prerequisite to the existence of a contract. Section 9–01–11, NDCC, provides as follows:

"A condition precedent is a condition which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed."

*Mattco, Inc. v. Mandan Radio Ass'n, Inc.,* 224 N.W.2d 822 (N.D.1974); *Quinn Distributing Company v. North Hill Bowl, Inc.,* 139 N.W.2d 860 (N.D.1966); *Lilly v. Haynes Co-op. Coal Mining Co.,* 50 N.D. 465, 196 N.W. 556 (1923). Where, as here, obtaining financing is made a condition precedent to a binding contract, there is no enforceable contract until financing is obtained. That condition failed to materialize here. We therefore agree with the trial court that the condition precedent was not fulfilled, and consequently the agreement was not binding upon the parties. Having determined that the contract was not binding, it necessarily follows that its provisions are of no effect, including the provision regarding forfeiture of earnest money by the buyer as liquidated damages.

■ Krugers, in their suit against Pierce and Engesser of Bowman Real Estate, alleged that the realtors failed to represent and support the Krugers in matters involving the purchase contract and acted beyond the scope of their authority in returning the $5,000 earnest money to the Soreides. To resolve this question we need to examine the appropriate provisions of the listing contract as to what the owner and broker each promises to do. The instrument is entitled "Authorization. to Sell" and was on a printed form, with blanks to be filled in, relating to description, price, terms, percent of commission, and other variables. The form, we assumed, was supplied by the broker, who may also have drafted and prepared the form of the contract.

While the contract is replete with promises and obligations of the owner and is specific on matters relating to price, terms of payment and related matters, it is sketchy and wanting with reference to the promises and obligations of the broker. In this respect it is barren except for the promise of the broker that "in consideration of the foregoing listing and authorization the undersigned broker agrees to use diligence in procuring a purchaser."

The contract contains no provision stating what actions the broker will take to find a buyer, such as advertising in certain papers, radio, or TV. Neither does it set out what is expected of the broker in showing the property to prospective purchasers, or what the broker will do to become familiar with the property so he may intelligently and honestly answer questions of potential purchasers. The contract is silent as to what the situation will be if the property is sold for a lesser amount, either by the owner or another agency.

More specifically, the contract contains no provision requiring the brokers to help a prospective purchaser secure financing or to advise what property, if any, is to be given as security or mortgaged in the event of time payments. Neither are the brokers, under the contract, required to advise the owners as to which type of security or mortgage is best suited.

Because the agreement was scanty as to the duties of the broker, and no evidence

was introduced setting out the customs and practices in the community, we have no justification to employ or resort to implications for the purposes of establishing liability against the brokers and in favor of the owners.

The realtors' handling of the agreement and the events which followed may not have been exemplary, particularly as to the returning of the "earnest money" without first informing the Krugers or obtaining their consent and by not communicating more fully with the owners. However, their conduct was not unconscionable toward the owner nor was it shown to be in bad faith or in the nature of infidelity so as to constitute a violation of the provisions of the North Dakota Real Estate Licensing Law cited to us by the Krugers, nor of any other statutory provisions of which we are aware. Nor have the owners cited to us any regulation which was violated creating a liability upon the brokers and in favor of the owners. We also observe, but without further comment, that the owners, in oral argument, stated they have no intention of filing a complaint with the Real Estate Commission.

We agree with the trial court in this instance that the brokers' conduct did not constitute a breach of contract or negligence. We also conclude that the trial court did not err in dismissing the complaint against Engesser and Pierce.

Defendants Pierce and Engesser in the same action, but based on the second listing, counterclaimed against the Krugers, contending they were entitled to a six percent commission on the ultimate sale of the Kruger ranch to Uttke and Ketterling. Following a dismissal of this counterclaim by the trial court and the subsequent appeal by the Krugers, the defendants cross-appealed, claiming that the listing agreement dated 30 June 1975 between Krugers and Bowman Real Estate had not expired at the time the property was sold, and that said agreement entitled them to a commission even if the property was sold directly by the Krugers. The agreement provided as follows:

"I hereby agree to pay said broker as commission six (6%) per centum except, commission to be ten (10%) on all undeveloped lots and mobile homes six per cent (6%) of the selling price should, during the time set forth herein, said property be sold by said broker or by me or by another broker or through some other source or whether said property be withdrawn from sale, transferred, conveyed or leased without approval of said broker."

The trial court dismissed the counterclaim of Bowman Real Estate on the ground that the listing contract was not signed by Mrs. Kruger, who had a one-half interest in the listed property, apparently on the assumed grounds that the status of the listing contract was similar to that of a purchase contract.

We view a listing contract or an authorization to sell in a different light than we do a purchase contract. Nevertheless, we affirm the judgment of dismissal, but for other pertinent reasons.

■ A listing contract or an authorization to sell agreement is basically an employment contract or a creation of an agency relationship. The contract may be either unilateral, executory, bilateral with exclusive agency or exclusive right to sell, or both, or a combination of any of those mentioned depending upon its contents. Similarly, different principles of law may apply to the contract depending on the contents and nature of the contract.

■ The listing agreement involved in the counterclaim is basically identical to the listing agreement under which the purchase contract was entered into with the Soreides, discussed earlier herein. After stating the promises of the owner, the contract closes with the promise of the broker, as follows: "In consideration of the foregoing listing and authorization the undersigned broker agrees to use diligence in procuring a purchaser."

The promise of the broker "to use diligence in procuring a purchaser," leaves little or no basis for the owner to recover

against the realtor for not diligently seeking to find a purchaser, without first establishing customs and practices and such related matters.

No evidence was introduced to establish any customs or practices in the real estate business in that community. As we said in reference to the first listing, implications could not be used to impose liability on the broker, likewise equity in this instance and under the circumstances of this case does not warrant the use of implications to establish customs and practices relating to the services which were expected to be performed by the realtor for the sole purpose of establishing a liability against the owner and in favor of the real estate agency (broker).

In fact, very little evidence was introduced to show what efforts the realtor made under the second listing, nor is there any evidence that the sale to Uttke and Ketterling was in any way brought about by the efforts of the real estate broker.

The brokers, for whatever reason, apparently did not strongly believe that they were entitled to the commission. When the owner approached them to forego the commission on the grounds that the broker did not produce the sale and that the purchase was not produced as a result of the efforts of the broker, the broker agreed to forego the commission if Kruger would not sue the Soreides.

We have examined reliable references, such as 12 Am.Jur.2d Brokers § 226 at 969, and 12 C.J.S. Brokers § 20 at p. 58, and § 94 at 219 and 220, from which we find that there is no clear-cut settled view concerning listing agreements and the circumstances under which commissions will be recoverable.

With this background, we reviewed some North Dakota cases.

In *Anderson & Jorgenson v. Johnson,* 16 N.D. 174, 112 N.W. 139 (1907), the court had under consideration a purchaser's contract with a realtor. The court held that it is incumbent upon the realtor in an action to recover commission to prove that the person produced as the owner of the property was willing to sell at the stated price, and also that the owner was able to convey a marketable title to the purchaser.

In *Fulton v. Cretian,* 17 N.D. 335, 117 N.W. 344 (1908), the court held that the realtor failed to produce a buyer at the rate of $21.50 per acre, or establish that the property was sold in excess of $20 per acre, in accordance with the agreement and is, therefore, not entitled to a commission.

In *Larson v. Newman,* 19 N.D. 153, 121 N.W. 202 (1909), the court held that the sale by a real estate agent on any other terms and conditions than those authorized by the owner is not binding on the owner.

In *Grangaard v. Betzina,* 33 N.D. 267, 156 N.W. 1035 (1916), the court held that a realtor not having produced a willing buyer at the price stated is not entitled to a commission where the owner later sold the land at a lower price where there is no proof that the owner did not act in good faith or that he prevented the broker from performing his contract.

In *Farmer v. Holmes,* 35 N.D. 344, 160 N.W. 143 (1916), the court held that the agent was entitled to a reasonable commission on the sale for his services performed on a quantum meruit basis. The court also observed that the action here was not an action for a specified commission.

In *Bready v. Moody,* 38 N.D. 321, 164 N.W. 946 (1917), the court held that in order for a real estate agent to recover commission for selling land he must tender a purchaser having ability and being ready and willing to pay for same upon the terms and conditions under which the land is listed, and the agent was authorized to sell.

The earlier cases merely stated general provisions of law with regard to what must be established by a broker before being entitled to a commission. Not until 1918 did the court have occasion to address itself to the exclusive agency and exclusive right-to-sell provisions.

In *Starks v. Springgate,* 39 N.D. 228, 167 N.W. 221 (1918), the landowner gave the realtor an exclusive right (agency) to sell

certain property up to a certain time. Before the time expired, the realtor found a purchaser and notified the owner by letter of such purchaser. In the meantime, another agent sold the property allegedly before the letter from the realtor was received by the owner. The court held that the realtor was entitled to the commission. But significantly the court stated:

"If the sale had been made by the defendant [owner], and not through an agent, a different question would arise. This question, however, is not presented in this case, and therefore needs no further attention."

In *Melzner v. Toman,* 57 N.D. 639, 223 N.W. 691 (1929), the court had under consideration a listing contract whereby the owner gave the realtor the exclusive right to sell the property for a stated or greater price and agreed to pay a commission for such sale. The listing contract specifically provided that if the owner were to make the sale the realtor would receive a stated commission which was less than the commission allowed if the realtor had made the sale himself. The evidence established that the realtor had advertised the property, had taken nine or ten prospective purchasers to view it, and had otherwise expended time and money as well as energy in an attempt to make the sale and had worked on it for about ten months, and that the sale was by the owner without the knowledge of the realtor.

The court, before holding the owner to the provisions of the contract and holding him liable for the commission, significantly stated, on page 692:

"It may be conceded that, even where a broker is by the terms of the contract given an exclusive right to sell, this does not prevent the owner from making an independent sale, and, where the broker is not the inducing cause of the sale, he may not recover a commission; but in this case there is an express agreement to pay a commission on a sale made by the owner if made within the time limits of the contract."

In *Henry S. Grinde Corporation v. Klindworth,* 77 N.D. 597, 44 N.W.2d 417 (1950), this court had under consideration an action by broker to recover commission on account of sale of realty which the owner had listed exclusively with him and which the owner sold to a third person. The district court gave judgment in favor of the realtor. The Supreme Court held that there was no part-performance of the contract of the sale of the realty by the owner to third persons during the life of the brokerage contract so as to take the oral contract of sale out of the statute of frauds, and therefore the broker was not entitled to recover commission. The court, in its reference to other cases and in the syllabus, indicated that if the sale had been made by another person the broker would have been entitled to the commission according to the provisions of the listing contract if it made the broker an exclusive agent.

In *O'Daniels v. Haman,* 65 N.W.2d 266 (N.D.1954), the court had under consideration a written contract giving a real estate broker the exclusive right to sell a creamery and an ice cream bar in one sale at a stipulated price for both, and containing no stipulation for compensation to the broker based upon a sale of a part of the property. The court held that the broker was not entitled to a commission for the sale of the creamery alone, sold by the owner, on the grounds that the listing contract was not divisible but required the entire unit to be sold in one sale.

In *Berry v. Heinz,* 139 N.W.2d 145, 148 (N.D.1965), the court quoted approvingly from 12 Am.Jur.2d *Brokers* § 266, at 969, a portion of which is:

". . . where the broker is given an exclusive right to sell property, as distinguished from an exclusive agency, he is held entitled to the agreed commission, or at least damages, when a sale is made by the owner, and it is immaterial that he was not the procuring cause thereof, provided, however that the employment contract is <u>supported by consideration and is not a mere unilateral offer,</u> and provided also, according to some cases, that the

broker has produced a ready, able and willing purchaser or can show damages." [Underscoring ours.]

In *Dardis v. Eddy Brothers,* 223 N.W.2d 674, 682 (N.D.1974), this court said:

". . . it would appear to us that Dardis [the real estate broker] would reap an unconscionable advantage if the listing agreement were enforced and the Eddys [the owners] were required to pay him as if the sale were consummated."

In this case the broker found a ready, willing and able buyer, but the owner refused to sell on the basis of mistake. The court found that a mistake existed and that a rescission had been accomplished, and the commission was denied. In a special concurring opinion the concern was expressed that the rule of substantial performance or expenditure should not apply when a broker under a valid listing agreement actually finds a buyer no matter how slight the effort. This, however, is not the situation in the instant case.

The foregoing review shows that North Dakota has not ruled specifically on the precise question involved here.

We believe that a strict interpretation of the contract in favor of the real estate broker would be inequitable, as would a strict interpretation in favor of the owner.

We are convinced that a more equitable solution would be a rule adopting an intermediate view similar to the view expressed in cases appearing later herein in the discussion of substantial performance as adequate consideration.

We stated earlier herein that listing contracts may be unilateral or bilateral, depending upon the contents.

The type of contract involved here is basically a unilateral contract until it is converted into a bilateral contract by substantial performance. This is the view that we are adopting for the disposition of the issues in the instant case, even though there is authority to the contrary.

Pierce and Engesser elected in their cross-appeal to sue on the contract for the six percent commission rather than damages and proceeded in that manner. The listing agreement provided that the commission would be due whether the property was sold by Bowman Real Estate, another broker, or by the Krugers themselves. This type of provision, however, has not been interpreted to entitle the broker to a commission under all circumstances. Rather, there must be some proof of consideration for the contract by performance of services by the real estate agent. The broker must show substantial performance of the duties imposed on him by the contract, even if he does not produce a buyer to be eligible for a commission. *Ladd v. Teichman,* 359 Mich. 587, 103 N.W.2d 338 (1960). In *H. M. Seldon Company v. Carson,* 11 Mich.App. 613, 162 N.W.2d 86 (1968), for example, the court allowed recovery of the commission where the broker had expended over $5,000 for promotion and advertising, including brochures and personal letters sent to over 300 people. Evidence in *Confer Bros., Inc. v. Colbrath,* 149 Minn. 259, 183 N.W. 524 (1921), showed that the broker had taken pictures for use in a display advertisement, ordered the advertisement published, and had taken at least two prospective purchasers to examine the property within the three days that elapsed before the property was sold by the owner himself. The broker was held to be entitled to his commission. In *Ladd, supra,* ample consideration was found where the broker had entered into duties involving surveying, supervising road construction, drawing restrictions, preparing a subdivision plat, and actively participating in discussions which led up to eventual sale by the owners. To recover a commission even under an exclusive right-to-sell provision, clear evidence of expenditure of time, effort, or money by the broker must be presented. Where such a showing is absent the listing agreement has the characteristics of a unilateral contract, which is not binding for lack of sufficient consideration.

Having elected to sue under the June 30, 1975, listing agreement for the commission, the burden was on Pierce and Engesser to demonstrate substantial per-

formance of their duties under the contract. It is important to note that two listing agreements were involved in this case. The first, between Mr. Kruger and Bowman Real Estate, was effective from September 23, 1974 to April 1, 1975. The second was a relisting agreement for the same property between the same parties, and is the contract in question here. Its terms were in effect from June 30, 1975, to November 1, 1975. Thus the second listing contract, which is the basis for the counterclaim, was the only contract in effect at the time the Kruger property was sold. The trial record contains considerable evidence of efforts expended by the brokers during the term of the first listing agreement, but virtually no showing of services performed under the June 30th agreement. We are satisfied that the brokers were given ample opportunity during trial to present evidence relating to this agreement, but failed to do so. At best, the record reveals a perfunctory effort by Pierce and Engesser to sell the property after June 30th. We find that the record reflects an absence of substantial performance by the realtors under the listing agreement of June 30, 1975, and, therefore, they are not entitled to recover the commission. In so holding we take cognizance of our conclusion on the first listing and the actions of parties (owners and real estate brokers).

We conclude that the dismissal of the counterclaim of Bowman Real Estate should be affirmed, and, therefore, the judgment of the trial court is in all things affirmed.

ERICKSTAD, C. J., and VOGEL, PEDERSON and PAULSON, JJ., concur.