**COLDWELL BANKER FIRST REALTY, INC., Plaintiff and Appellee,**

v.

**David S. KANE, Defendant and Appellant,**

**and**

**Charles W. Knapp, Defendant.**

Civ. No. 920021.

Supreme Court of North Dakota.

Nov. 5, 1992.

Craig R. Campbell of Gunhus, Grinnell, Klinger, Swenson & Guy, Fargo, for plaintiff and appellee.

David J. Hauff and Michael D. McNair of McNair, Larson & Carlson, Ltd., Fargo, for defendant and appellant; argued by David J. Hauff, Fargo.

VANDE WALLE, Justice.

David S. Kane appealed from a district court judgment which orders him to pay a real estate sales commission to Coldwell Banker First Realty (Coldwell). We affirm.

In September 1984, Kane was seeking a tenant or buyer for a building which he owned at 2601 North University Drive in Fargo. This commercial building was divided into three suites known as Suites A, B, and C. Kane contracted with Coldwell, a real estate agency in Fargo, to procure a tenant or buyer for the building. The contract specified that if a lessee was procured, the lease was to contain an option to purchase with the lessee giving ninety days notice, and the sale price to be arrived at by the average of two appraisals. If Coldwell was successful in its procurement efforts, Coldwell would receive "6% of the total rents collected over terms of the lease paid at signing of lease, 3% on renewals. 7% commission of the sale price less unused part of the lease that the Commission was paid upon." The employment contract was to expire on October 10, 1984.

Through Coldwell's efforts, a five-year lease for Suites B and C of 2601 North University Drive was secured with Pharma-

cology Research and Clinic Studies Institute, Ltd., a corporation owned by Drs. Albert Dietz and James Carlson. The lease, which was entered into on September 20, 1984, granted the lessee an option to purchase the entire building pursuant to the Kane/Coldwell employment contract as well as granting the lessee a right of first refusal in the event Kane received a bona fide offer to purchase the building from a third party. The lease also contained an option permitting Drs. Dietz and Carlson to lease Suite A of the building upon the expiration of the then existing lease to another tenant. Kane paid the appropriate rental commission on Suites B and C to Coldwell as per their employment contract.

Drs. Dietz and Carlson exercised their option to lease Suite A in 1986 thereby occupying the entire building. Kane has admitted liability for the commission and interest due to Coldwell on the lease of Suite A. The lease agreements for Suites A, B, and C were extended to February 28, 1991, through Addendum to Lease Agreements dated March 3, 1986.

In the fall of 1988, Kane approached Drs. Dietz and Carlson and offered to sell them 2601 North University Drive, the leased property, for $285,000 cash. Drs. Dietz and Carlson, aware of their right of first refusal and that their failure to exercise it would allow Kane to offer the property to a third party, chose not to purchase the property.

Kane then approached Employees Life Company (Employees), an insurance company to which he was apparently indebted, and offered to sell 2601 North University Drive to it for $285,000. Employees conditioned the purchase upon Kane procuring from Drs. Dietz and Carlson a lease extension. Thereafter, Kane negotiated a lease extension with Drs. Dietz and Carlson as well as a purchase agreement proposal. The purchase agreement proposed that Kane would sell the property to Employees who in turn would agree to give the doctors a purchase agreement and financing for the property to be executed within the next twelve months. The terms of the option as negotiated by Kane allowed Drs.

Dietz and Carlson to purchase the property for the same price at which it was to be purchased by Employees and pursuant to specific financing terms offered by Employees. Employees would sell the property to the doctors following a payment plan of $5,000 due at the time of the purchase of the property, at least 25% of the purchase price due in one year, and 75% of the purchase price financed as a mortgage at 11% with a 20–year amortization schedule and a 10–year balloon payment.

In December 1988, Kane gave a warranty deed to the property at 2601 North University to Employees in return for $285,000. On the same day, Drs. Dietz and Carlson entered into a Contract for Deed with Employees for the purchase of the property with a down payment of $5,000. The doctors and Employees subsequently cancelled their lease agreement and thereafter Employees transferred title to the property via a warranty deed to the doctors in 1989.

Coldwell commenced this action alleging, among other things, that as the "procuring cause" of the lease which lead to the sale, Coldwell was contractually entitled to a commission on the sale of the building to Drs. Dietz and Carlson. The district court concluded that Coldwell was the procuring cause of the sale and ordered Kane to pay to Coldwell the agreed upon commission.

### The Broker/Seller Relationship

■ Coldwell is a licensed real estate broker under the laws of the State of North Dakota. A real estate broker is one who "for another, for a fee, commission, salary, or other consideration, or with the intention or expectation of receiving or collecting such compensation from another, engages in or offers or attempts to engage in, either directly or indirectly by a continuing course of conduct or by a single act or transaction," such acts as listing, selling, leasing, advertising, or other actions in relation to real estate. NDCC § 43–23–06.-1(5). Implicit in such a description is an underlying contractual relationship between the respective broker and seller. A listing contract or authorization to sell

agreement is basically an employment contract or a creation of an agency relationship. Different principles of law may apply to this contract depending on the contents and nature of the contract. *Kruger v. Soreide*, 246 N.W.2d 764 (N.D.1976).

■ A contract—an agreement to do or not to do a certain thing—is the basis of one or more obligations upon the contracting party or parties. NDCC §§ 9–01–01, 9–01–05. A determination of these obligations requires interpreting the language of the contract. *Id.* The language of the contract governs its interpretation if the language is clear and explicit. NDCC § 9–07–02. If the parties' intentions in a written contract can be ascertained from the writing alone, the interpretation of the contract is a question of law for the court to decide. *Tallackson Potato Co., Inc. v. MTK Potato Co.*, 278 N.W.2d 417 (N.D. 1979). The language underlying the Kane/Coldwell employment contract afforded Coldwell the opportunity to procure a lessee or buyer of the property in question. If such a procurement took place before the contract's expiration, Coldwell was to receive a commission. This language is clear and explicit.

■ Our Court has stated that for a broker to be entitled to a commission in North Dakota, the broker must generally produce a prospective purchaser ready, willing, and able to purchase (or lease, as the case may be) on the terms set forth in the agreement or, if the agreement leaves terms open for other terms acceptable to the land owner, then on such acceptable terms. *Schmidt v. First Nat. Bank & Trust Co.*, 453 N.W.2d 602 (N.D.1990); *Goetz v. Anderson*, 274 N.W.2d 175 (N.D. 1978). This general theory is sometimes known as the "procuring cause" doctrine in other jurisdictions. *E.g., Perdue v. Gates*, 403 So.2d 165 (Ala.1981). The broker is entitled to a commission when the broker produces such a person, notwithstanding a failure to consummate the transaction or the refusal of the owner to transact business with the prospective purchaser. *Goetz, supra.* In procuring such a "ready, willing, and able" buyer or lessee, the broker must have in fact *procured* such a party. Procurement and the subsequent right to a commission must be shown by clear evidence of an expenditure of time, effort, or money by the broker. *Kruger, supra.*

From the clear and explicit language of the Kane/Coldwell employment contract, the lessees, Drs. Dietz and Carlson, were procured and presented to Kane through Coldwell's efforts. The lessees were certainly ready, willing, and able to lease the property as shown by their entering into and being bound by the lease agreement. Kane did not deny Coldwell a lease commission. Despite Coldwells' admitted procurement of the lessees, Kane disputes Coldwell's right to a sale commission. Kane argues that there was no formal contact between Coldwell and Employees concerning the purchase of the property, nor, he argues, was there any contact between Coldwell and the doctors after the initial lease was executed. Therefore, he contends that Coldwell did not "procure" the sale and is not entitled to a commission for the sale.

Kane overlooks the express wording of his employment contract with Coldwell. Although the employment contract between Kane and Coldwell expired on October 10, 1984, their contractual relationship did not end at that time nor at the time Coldwell procured a lessee. In order to receive a lease commission, Coldwell was to produce a ready, willing, and able lessee by October 10, 1984. Coldwell procured such a lessee. Kane accepted the lessees, paid the lease commission to Coldwell, accepted the benefits of having a lessee, and thereby cannot deny the existence of the contract or his subsequent obligations under it. The terms of the Kane/Coldwell employment contract gave the lessees procured by Coldwell a right of first refusal to purchase the building and, if the lessees exercised their option and purchased the building, Coldwell was to receive a sales commission. Plainly, if the lessees purchase, Coldwell receives a commission.

Kane convinced the district court to adopt the "procuring cause" test as stated

in *Perdue v. Gates, supra,* in deeming Coldwell the procuring cause of the subsequent sale of the building to the doctors. The district court's reliance upon *Perdue* is unnecessary. In *Perdue,* the Alabama court set forth guidelines for determining whether a broker was the procuring cause of a real estate sale. However, whether or not Coldwell was the "procuring cause" of the sale of the building as defined by *Perdue* is immaterial. Kane and Coldwell had an express and explicit contract which allowed Coldwell a sales commission if the lessee it procured would eventually purchase the realty. The employment contract between Kane and Coldwell was of a continuing nature, and the purchase of the property by the lessees pursuant to the option in the lease, although after the expiration of the employment contract, entitles Coldwell to a sales commission. Coldwell was the procuring cause of the *lease* and, as a result of the explicit contract language, it is in effect the "procuring cause" of the subsequent *sale* of the building. Whether or not Coldwell's action would pass the *Perdue* test is irrelevant in view of the terms of its contract which make Coldwell the procuring cause regardless of its subsequent actions or inactions.

### Intervening Third Parties

Kane offered Drs. Dietz and Carlson the opportunity to purchase the building. After they refused to exercise their option, Kane sold the building to Employees. Kane now contends that this intervening third party terminates Coldwell's right to a commission. As noted earlier, a brokerage contract creates an employment or agency relationship between the two parties. *Kruger, supra.* Agency is the relationship which results where one person, the principal, authorizes another, the agent, to act for them in dealing with a third person. NDCC § 3–01–01. This relationship is differentiated from other relationships by its characteristic fiduciary qualities. 2A C.J.S. *Agency,* § 4 (1972); Restatement (Second) of Agency, § 1 (1957); *cf. Gillmore v. Morelli,* 472 N.W.2d 738 (N.D.1991) [brokers duty to employer is essentially the same fiduciary duty that an agent owes principal]. As principal—the party for whom action is to be taken—Kane's duties and liabilities to his agent, Coldwell, rest primarily upon the terms of the agency (employment) contract and upon his obligation to use good faith with his agent. 3 C.J.S. *Agency,* § 318 (1973). As a result of this good faith requirement, the principal is under a duty not to prevent the fulfillment of a condition on which compensation is based by unwarranted conduct. *Id.* at § 346. *See generally,* Restatement (Second) of Agency, §§ 432 *et seq.* (1957).

In this case, it was shown to the trial court that Kane actively pursued, sought, negotiated, and had a vested interest in the sale of the building from Employees to Drs. Dietz and Carlson. Kane negotiated the financial terms, sale price, interest rates, and mortgage amounts as well as negotiating the timing of the sale. Because Kane was still obligated under his contract with Coldwell, these unilateral actions by Kane effectively shut Coldwell out of the sale process, thus depriving it of its contractual right to a commission. Kane's alleged ignorance of the contract and his duties from it are no defense, for one is generally presumed to know of what one contracts.

Similarly, Kane cannot rely on the theory that an innocent seller is not liable to a broker for a commission when the seller acts in good faith and without knowledge that the purchaser is the secret representative or an agent of the customer procured by the broker. 12 C.J.S. *Brokers,* § 174 (1980); *Zetlin v. Scher,* 217 A.2d 266 (Md. 1966); *Ritch v. Robertson,* 93 Conn. 459, 106 A. 509 (1919). Whether or not Employees was an agent of the doctors is beside the point. Kane's actions in facilitating, negotiating and even encouraging the sale of the building from Employees to the doctors remove these activities from the realm of "good faith" and "without knowledge." Kane knew of the relationship he established between Employees and the doctors and cannot now claim innocence.

The nature of this transaction in these circumstances—Kane's active involvement in negotiating, Kane's knowledge of the

future sale to Drs. Dietz and Carlson, the transfer from Employees to the doctors on the same day, as well as the underlying principles of good faith required by Kane and a broker's contractual right to a commission—all support the trial courts view that the "sale" to Employees was a mere financing mechanism. Kane's actions cannot deprive Coldwell of its contractual right to a commission.

The judgment of the trial court is affirmed.

ERICKSTAD, C.J., MESCHKE and LEVINE, JJ., and VERNON R. PEDERSON, Surrogate Judge, concur.

VERNON R. PEDERSON, Surrogate Judge, sitting in place of JOHNSON, J., disqualified.