Edmer A. GOETZ d/b/a Edmer A. Goetz Realty Co., Plaintiff and Appellant,

v.

C. D. ANDERSON and Pauline E. Anderson, Defendants and Appellees.

Civ. No. 9490.

Supreme Court of North Dakota.

Nov. 30, 1978.

Garaas Law Firm, Fargo, for plaintiff and appellant; argued by Jonathan T. Garaas.

E. J. Rose, Bismarck, for defendants and appellees.

SAND, Justice.

This is an appeal by Edmer A. Goetz, d. b. a. Edmer A. Goetz Realty Co. [Goetz Realty], from a judgment dismissing its complaint against C. D. Anderson and Pauline Anderson for a realtor's commission arising out of property listed for sale under an exclusive listing agreement.

In 1976, C. D. Anderson contacted Goetz Realty concerning the appraisal of property located in Bismarck, known as the Anderson Distributing Co. building. After some preliminary negotiations, an exclusive listing agreement was entered into between the Andersons and Goetz Realty to sell the Anderson property for $165,000 or any other price agreed upon by the seller, for which Goetz Realty was to receive a ten percent commission.

Goetz Realty placed advertisements in the Bismarck Tribune for approximately 40 days, and made phone calls to clients in an effort to locate a buyer for the property.

Presumably as a result of the realtor's efforts, Jack Clairmont contacted Goetz Realty and expressed a desire to purchase the Anderson property on behalf of Arrow Contractors, Inc. [Arrow]. Clairmont indicated

the terms on which Arrow would be willing to buy the property and an earnest money receipt and agreement, was drafted and dated 3 December 1976, incorporating those terms. The draft agreement, in part, stated:

"RECEIVED FROM Jack Clairmont the sum of $5,000 . . . as earnest money and in part payment for the purchase of the . . . [Anderson Distributing Co. property] . . ."

The draft agreement provided for an earnest money receipt of $5,000 with an additional $10,000 to be paid on the date of closing with the remaining $150,000 purchase price, plus interest, to be paid through installment payments. The agreement provided that the conveyance would be by a contract for deed. Because the draft agreement listed Jack Clairmont as purchaser of the property rather than Arrow, it was never signed by a representative of that company.

A new earnest money receipt and agreement, listing Arrow as the purchaser, was subsequently drafted and dated 6 December 1976. Similar to the first agreement, it also provided for a $5,000 earnest money amount, however, it did not provide for the additional $10,000 to be paid on the date of closing. Rather, the $10,000 payment was to be made on July 1, 1977, six months after the date of closing. A conflict in the testimony exists concerning if the $10,000 payment was changed at the suggestion of Anderson or Clairmont. Goetz Realty offered testimony that Anderson requested the $10,000 payment be deferred until after 1 January 1977 to avoid taxable gain on the amount of the payment for the year 1976. Anderson testified the change was at the request of Clairmont. The evidence is undisputed, however, that on 6 December 1976, Arrow was no longer willing to make the additional $10,000 payment on the date of closing because the company needed the money for bid bonds on contracts in which it was interested.

The agreement containing the changes was signed by Mr. and Mrs. Anderson and by Jack Clairmont as general manager for Arrow.

Also, on 6 December 1976, Anderson received a promissory note due 1 July 1977, signed by Jack Clairmont as general manager for Arrow. The purpose of this note is also disputed. Goetz Realty offered testimony that the note was given to provide additional security to Anderson, as he was somewhat reluctant to sign an earnest money agreement under which he would receive only a $5,000 down payment. Goetz Realty also offered testimony that no money was to be received for the note until its due date of 1 July 1977. Anderson testified the note was given to him so he could obtain funds additional to the $5,000 earnest money amount from which he could pay the ten percent realtor's commission.

Anderson testified that at the direction of Goetz Realty he took the promissory note to the Mandan Security Bank which refused to negotiate the note, questioning Clairmont's authority to execute it. Anderson thereupon returned to Goetz Realty and requested a financial statement for Arrow. He was informed no financial statement was in existence as the corporation was newly formed. Anderson then requested a financial statement for Jack Clairmont. He was told no financial statement for Clairmont would be provided because Arrow was the purchaser of the property and Clairmont was only the general manager of the company. Anderson then obtained a copy of the articles of incorporation of Arrow which were filed with the Secretary of State on 2 December 1976 and which listed as incorporators Clairmont's college-age son and two other persons. Anderson also learned through his own investigation that there were a number of substantial outstanding judgments against Jack Clairmont and a corporation with which he was formerly associated.

In preparation of the 30 December 1976 closing date, Goetz Realty contacted its attorney to prepare the contract for deed called for in the earnest money agreement. Goetz Realty, through its agent, also informed the attorney that Anderson was hesitant about the sale because of the un-

certain financial status of Arrow, whereupon the attorney suggested a lease coupled with an option to purchase as an alternative. Anderson and Clairmont apparently agreed to the suggested arrangement and directed Goetz Realty to proceed with the preparation of a lease with option to purchase agreement providing for a six-month lease with an option to purchase and incorporating basically the same installment payments as set forth in the earnest money agreement dated 6 December 1976. A meeting was set for the closing of the lease with option to purchase agreement, but Anderson did not appear, stating later that a number of provisions in the agreement were not acceptable to him.

Clairmont later delivered a letter dated 13 January 1977 to Goetz Realty stating the company would be willing to purchase the Anderson property under the terms of the original earnest money agreement until 1 March 1977. The letter also contained a request for the return of the $5,000 earnest money, with which Goetz Realty complied.

Goetz Realty filed a complaint in Burleigh County district court against the Andersons seeking a judgment for the ten percent realtor's commission. The complaint was dismissed following a bench trial on 8 February 1978 and Goetz Realty appealed.

The basic issue presented is whether or not Goetz Realty earned the realtor's commission provided for in the exclusive listing agreement with the Andersons dated 2 August 1978.

The exclusive listing agreement entered into between the Andersons and Goetz Realty provided, in part:

"I (we) hereby agree to pay you, or any other broker working in cooperation with you, in cash for your services a commission of 10% of the total selling price, in the event you shall find a buyer, ready and willing to purchase, exchange, option, or lease, with an option to purchase where such option is exercised, said property for the price and terms stated, for such terms as I may accept, . . ."

The district court, in dismissing the complaint, made the following pertinent findings of fact:

"(5)

"Despite the terms of the earnest money agreement, both parties subsequently agreed that a lease coupled with a contract for deed would be the manner in which to proceed. These documents were then prepared by an attorney for the plaintiff and copies furnished to the defendants. A closing date to execute the same was set up by the plaintiff to be held on December 31, 1976, but the defendants did not attend such meeting due to their dissatisfaction with the proposed lease. As a result negotiations ceased and the transaction was never consummated.

"(6)

"The earnest money agreement between the parties referred to above was abandoned and there was never an offer and acceptance to which the parties agreed and no binding contract was ever formed.

"(7)

"The plaintiffs have failed to show any arbitrary action on the part of the defendants in refusing to accept the terms and conditions tendered to them by the prospective purchaser."

The court's memorandum opinion, which in part stated as follows, further clarifies the court's decision:

"The plaintiffs have failed to show any arbitrary action on the part of the Defendant in refusing to accept the terms and conditions tendered to him by the prospective purchaser. Accordingly, the plaintiffs have failed to establish the prerequisites to their collecting under the listing agreement, and the earnest money contract, having been abandoned, can constitute no authority for allowing such payment."

Goetz Realty contended the trial court erred in requiring proof of either an arbi-

trary refusal to sell or a completed transaction as a prerequisite to establishing its right to a commission. It argued the correct test to determine if a commission has been earned is one of substantial performance as set forth by this court in *Kruger v. Soreide*, 246 N.W.2d 764 (N.D.1976). We stated in *Kruger* at page 773:

"The broker must show substantial performance of the duties imposed on him by the contract, even if he does not produce a buyer to be eligible for a commission. [Citation omitted.]"

■ In that case we held a listing agreement is basically a unilateral contract until it is converted into a bilateral contract by substantial performance. We held that a broker was not entitled to a commission if the owner sold property through his own efforts during the term of an exclusive listing agreement with the broker and if there was no evidence of an expenditure of time, effort, or money (substantial performance) on the part of the broker. In this case we are not dealing with property sold during the term of the listing agreement, but rather with a potential buyer located by the broker and found unacceptable by the seller. We thus have another factor, element, or test to consider.

■ This court has stated a broker is entitled to compensation called for by his contract for employment when he produces a person who is ready, able, and willing to accept and live up to terms offered by the owner or acceptable to him. *Pehrson v. Schaffer*, 196 N.W.2d 84 (N.D.1972); *Schneider v. Martin*, 136 N.W.2d 153 (N.D. 1965); *Ward & Murray v. McQueen*, 13 N.D. 153, 100 N.W. 253 (1904). We have stated that in the absence of a stipulation to the contrary, the broker is entitled to his commission when he produces such a person, notwithstanding a failure to consummate the transaction or the refusal of the owner to transact business with the prospective purchaser. *Schneider v. Martin, supra; Ward & Murray v. McQueen, supra.*

■ We note the listing agreement in this case excludes the term "able" from the traditional description of a buyer a broker is required to produce to earn his commission. We conclude, however, that exclusion of the word "able" does not relieve the broker of his duty to produce a buyer capable of purchasing upon the terms specified by the broker's employer. Thus, in general, the proposed purchaser must have the legal capacity to purchase, in addition to having sufficient financial ability not only to make a down payment required by the terms of the seller, but also to complete the contract according to its terms, that is, to meet any deferred payments. *Reynor v. Mackrill*, 181 Iowa 210, 164 N.W. 335, 1 A.L.R. 523 (1917); *Shell Oil Co. v. Kapler*, 235 Minn. 292, 50 N.W.2d 707 (1951); 12 Am.Jur. *Brokers* § 184. A conclusion that a broker must only produce a ready and willing purchaser to be entitled to a commission would produce weird and unjust results.

■ Accordingly, we conclude that a broker is not entitled to a commission when a sales transaction is not completed, because the seller, for reasonable cause, rejected the buyer produced by the broker. *Huntley v. Smith*, 153 Minn. 297, 190 N.W. 341 (1922).

Goetz Realty contended the question of whether or not the Andersons' rejection was reasonable is not an issue in this case. It argued that when a seller enters into an earnest money agreement contract with a buyer produced by a broker, the question of the ability, readiness, and willingness of such buyer is no longer material. Goetz Realty argued that whenever a seller executes an earnest money agreement to sell with a prospective buyer secured by an authorized broker, the seller has accepted the buyer ending the matter as far as the broker's right to a commission is concerned.

We recognize a number of courts in this country have adopted a rule that a seller is estopped from denying a prospective purchaser's ability after entering a contract to sell. *Bailie v. Ridker*, 249 Minn. 161, 81 N.W.2d 798 (1957); *Wauwatosa Realty Co. v. Paar*, 274 Wis. 7, 79 N.W.2d 125 (1956); *Anderson v. Craig*, 111 Mont. 182, 108 P.2d 205 (1940); *Scully v. Williamson*, 26 Okl. 19, 108 P. 395 (1910); 12 Am.Jur.2d *Brokers*

§§ 183, 184. Courts have held that a broker is entitled to a commission for securing a purchaser, if the seller enters into a contract to sell to the purchaser, even if the purchaser is *later* found to be financially unable to complete the transaction. *Scully v. Williamson, supra; Hatch v. Dayton*, 130 N.J.L. 425, 33 A.2d 350 (1943).

In the case of *Ellsworth Dobbs, Inc. v. Johnson*, 50 N.J. 528, 236 A.2d 843 (1967), the New Jersey Supreme Court examined the rule described above and as applied by the courts of that state and found it deficient as an instrument of justice. In *Ellsworth*, a real estate broker procured a prospective purchaser for the defendant-seller's property pursuant to an agreement entitling the broker to a commission for producing a buyer for defendant's property. Although the defendant and the prospective purchaser entered into a contract for sale, the transaction was not "closed" because of the buyer's inability to obtain financial backing for his intended development of the property. The seller released the buyer from the contract and the broker brought an action against the seller seeking a commission pursuant to the listing agreement. In holding the broker was not entitled to a commission, the New Jersey court stated, at page 853:

"It seems to us that fairness requires that the arrangement between broker and owner be interpreted to mean that the owner hires the broker with the expectation of becoming liable for a commission only in the event a sale of the property is consummated, unless the title does not pass because of the owner's improper or frustrating conduct.

. . . . .

"Since the broker's duty to the owner is to produce a prospective buyer who is financially able to pay the purchase price and take title, a right in the owner to assume such capacity when the broker presents his purchaser ought to be recognized. It follows that the obligation to inquire into the prospect's financial status and to establish his adequacy to fulfill the monetary conditions of the purchase must be regarded logically and sensibly as resting with the broker. Thus when the broker produces his customer, it is only reasonable to hold that the owner may accept him without being obliged to make an independent inquiry into his financial capacity. That right ought not to be taken away from him, nor should he be estopped to assert it, simply because he 'accepted' the buyer, i. e., agreed to convey to him if and when he paid the purchase price according to the terms of the contract. In reason and in justice it must be said that the duty to produce a purchaser able in the financial sense to complete the purchase at the time fixed is an incident to the broker's business; so too, with regard to any other material condition of the agreement to purchase which is to be performed at the closing. In a practical world, the true test of a willing buyer is not met when he signs an agreement to purchase; it is demonstrated at the time of closing of title, and if he unjustifiably refuses or is unable financially to perform *then*, the broker has not produced a willing buyer."

The court further went on to hold, at page 855:

"Execution of a contract to sell to the tendered purchaser, without more, will not bar the owner from relying upon the financial or other inability or failure of the buyer to complete his undertaking as an absolute defense to the broker's suit."

The holding of the New Jersey court has been either adopted or expressly approved by a number of jurisdictions. *Potter v. Ridge Realty Corporation*, 28 Conn.Sup. 304, 259 A.2d 758 (1969); *Rogers v. Hendrix*, 92 Idaho 141, 438 P.2d 653 (1968); *Mullenger v. Clause*, 178 N.W.2d 420 (Iowa 1970); *Winkelman v. Allen*, 214 Kan. 22, 519 P.2d 1377 (1974); *Tristram's Landing, Inc. v. Wait*, 367 Mass. 622, 327 N.E.2d 727 (1975); *Cornett v. Nathan*, 196 Neb. 277, 242 N.W.2d 855 (1976); *Setser v. Commonwealth, Inc.*, 256 Or. 11, 470 P.2d 142 (1970); *Staab v. Messier*, 128 Vt. 380, 264 A.2d 790 (1970). For a thorough discussion of the *Ellsworth* case see Note, 23 Rutgers Law Review 83 (1968).

■ We join this growing list of jurisdictions in holding that a seller is not estopped from denying a prospective purchaser's ability by executing a contract to sell to the purchaser. Although a broker may be entitled to a commission if the seller's refusal to consummate the transaction is arbitrary, capricious, unreasonable, or wrongful, the broker may not be entitled to a commission if the refusal is for reasonable cause relating to the transaction.

We now examine if the Andersons' rejection of Arrow as a purchaser was unreasonable as related to this transaction. The Minnesota Supreme Court in *Shell Oil Co. v. Kapler, supra,* discussed the rules for determining a purchaser's financial ability to buy, as follows:

"Rules for testing a purchaser's financial ability to buy are not to be reduced to any unyielding formula, but must be flexible enough to accomplish their purpose according to the particular facts of each case. In ascertaining the rules reflected by an endless variety of cases, it is particularly important to bear in mind that no decision is authoritative beyond the scope of its controlling facts. Difficulty in both stating and applying the rules stems principally from a failure to keep in mind that *their purpose*—the protection of good-faith sellers as well as of bona fide purchasers, brokers, and other persons similarly situated—*is to establish a purchaser's financial ability to buy with reasonable certainty.* A purchaser may not have the necessary cash in hand, but that alone, it is recognized, does not disqualify him if he is otherwise so situated that he is reasonably able *to command the requisite cash at the required time.* On the other hand, the seller is not required to part with his property to a purchaser whose financial ability rests upon nothing more than shoestring speculation or upon attractive probabilities which fall short of reasonable certainty. In short, the rules are designed to protect the seller by binding him to a sale only where there is a reasonable certainty of the purchaser's financial ability to pay and, on the other hand, to protect the purchaser—and persons similarly situated—from a technical, insubstantial, or sharp-dealing disqualification.

"Generally speaking, a purchaser is financially ready and able to buy: (1) If he has the needed cash in hand, or (2) if he is personally possessed of assets—which in part may consist of the property to be purchased—and a credit rating which enable him with reasonable certainty to command the requisite funds at the required time, or (3) if he has definitely arranged to raise the necessary money— or as much thereof as he is unable to supply personally—by obtaining a *binding commitment* for a loan to him for that purpose *by a financially able third party,* irrespective of whether such loan be secured in part by the property to be purchased."

The reasoning of the Minnesota Supreme Court is persuasive.

Although the district court, in its conclusions of law, relied heavily on the abandonment of the earnest money receipt and agreement as grounds for dismissing the plaintiff's complaint, it also stated in its findings of fact that:

"The plaintiffs have failed to show any arbitrary action on the part of defendants in refusing to accept the terms and conditions tendered to them by the prospective purchaser."

The above finding is somewhat unclear as to whether it refers to Andersons' refusal to accept the lease with option to purchase arrangement or to Andersons' abandonment of the entire earnest money agreement, or to both. The record indicates, however, that the finding is amply supported by evidence in either situation and thus is not clearly erroneous. (Rule 52(a), NDRCivP.)

■ The trial court found that the Andersons and Arrow abandoned the earnest money receipt and agreement. The finding is supported by the actions of Anderson and Arrow directing Goetz Realty to draw up a lease with option to purchase in lieu of a contract for deed, as provided for in the earnest money agreement. When the

terms of the lease with option to purchase agreement were found unacceptable to the Andersons, no further action was taken on the part of the Andersons or Arrow to complete the sales transaction either on its terms or on any other terms suitable to the parties to the agreement. The trial court's finding that the earnest money agreement was abandoned is further evidenced by Arrow's request to Goetz Realty for the return of the $5,000 earnest money down payment. Compliance with that request by Goetz Realty completed and constituted tacit approval of the abandonment.

 The decision to abandon was made in response to the Andersons' concern over the financial status and ability of Arrow to complete the contract. The testimony of both Clairmont and the agent for Goetz Realty stated that the $10,000 promissory note of 6 December 1976 was given to the Andersons in an effort to satisfy that concern. The record indicates that neither Arrow nor Goetz Realty made any other efforts to assure Anderson of the financial stability of Arrow. Nor did Goetz Realty present any evidence at the trial that the concern of the Andersons was unreasonable or unfounded. Anderson's inability to negotiate the promissory note given him as assurance of Arrow's financial stability, along with the fact that no other evidence was presented to him as to the amount of capitalization or other assets of Arrow, demonstrates Anderson's concerns were justified. Under the facts of this case, the decision to abandon the earnest money agreement as executed was an implied recognition that the concerns of the Andersons as to the financial ability of Arrow to complete the contract were valid and reasonable. Accordingly, the district court's finding that "the plaintiffs have failed to show any arbitrary action on the part of the defendants in refusing to accept the terms and conditions tendered to them by the prospective purchaser" was not clearly erroneous.[1]

 In summary, the procuring of a prospective purchaser under an exclusive listing agreement implies the production of a ready, willing, and financially able purchaser. The financially able condition refers to the requirement at the time of clos-

---

1. We note that the Andersons also pleaded as a defense the lack of authority on the part of Clairmont, as the agent for Arrow, to enter into a contract for the purchase of realty. North Dakota Century Code § 9–06–04 provides that a contract to sell real estate, if made by an agent, is invalid unless the authority of the agent is in writing subscribed by the party to be charged. Although Clairmont testified at trial that he had written authority to act as general manager for Arrow, no evidence was offered that Clairmont's authority as general manager included the power to contract for the purchase of realty, nor was the written document authorizing Clairmont's authority introduced as evidence at trial.

We also note that § 10–07–01, NDCC, provides a

". . . corporation may empower by its bylaws any one or more of its officers severally or jointly to execute and acknowledge in its behalf conveyances, transfers, assignments, releases, satisfactions, or other instruments affecting liens upon, titles to, or interests in real estate. . . ." [Emphasis added.]

As an earnest money agreement (and contract for deed) could be construed as conveying equitable title or interest in the subject real estate, compliance with this latter Century Code section may have required that Clairmont's authority to purchase real estate for Arrow to have been contained in the bylaws of the corporation. There is no evidence in the record indicating Clairmont's authority to purchase real property was contained in the bylaws of Arrow or even that any bylaws for the corporation existed on the date the earnest money agreement was executed.

If Clairmont's authority to purchase real property on the behalf of Arrow had been found defective under either § 9–06–04, NDCC, or § 10–07–04, NDCC, the Andersons would have been unable to enforce the earnest money agreement against Arrow. This court has held on a previous occasion that execution of a contract to sell which is not valid, binding, and enforceable does not entitle a broker to a commission. *Henry S. Grinde Corp. v. Klindworth*, 77 N.D. 597, 44 N.W.2d 417 (1950).

Because the record in this case is lacking as to the extent and source of Clairmont's authority as general manager for Arrow, and because we have decided this case on other grounds, we need not reach the issue of whether or not Clairmont's authority was deficient to exclude a valid contract for the sale of realty as to defeat the right of Goetz Realty to a commission.

ing the transaction of either having the funds to make the payment or be in a position to arrange for the necessary financing to pay for the property to be purchased, but does not refer to subsequent developments. It therefore follows that for a real estate broker to be entitled to a commission pursuant to an exclusive listing agreement he must produce a prospective ready, willing and financially able purchaser of the property. It also follows that if the seller rejects the purchaser, evidence must be introduced to establish that the seller's refusal to consummate the sale was arbitrary, capricious, unreasonable, or wrongful and was not for good cause. In this instance the realtor did not meet the foregoing requirements. Also, in this instance there was an abandonment of the earnest money agreement by both parties with tacit approval by the realtor.

The decision of the district court dismissing the plaintiff's complaint is affirmed.

ERICKSTAD, C. J., and PAULSON and PEDERSON, JJ., and ILVEDSON, District Judge, concur.

ILVEDSON, District Judge, sitting in place of VANDE WALLE, J., disqualified.