**ALLIED REALTY, INC., Plaintiff and Appellant,**

v.

**Gregory K. BOYER and Wendy Boyer, Defendants and Appellees.**

Civ. No. 9867.

Supreme Court of North Dakota.

Feb. 24, 1981.

As Amended Feb. 27, 1981.

Pitsenbarger & Miller, Moorhead, and Conmy, Feste & Bossart, Fargo, for plaintiff and appellant; argued by Keith L. Miller, Moorhead, Minn.

Bailey, Lies & Krassin, Wahpeton, for defendants and appellees; argued by Don Krassin, Wahpeton.

SAND, Justice.

Plaintiff, Allied Realty, Inc. [Allied] appealed a $7,500.00, plus costs, judgment in its favor resulting from an action on a $35,000.00 promissory note executed by defendants Gregory K. and Wendy Boyer[1] [Boyers] made payable and delivered to Allied. The promissory note was to assure Allied's commission pertaining to a real estate transaction between Ryan and Dan Hoffmeister [Hoffmeisters] and the Boyers.

Gregory Boyer and Allied entered into an exclusive listing agreement dated 14 Aug 1975 for the sale of a 2,204-acre parcel of land in Wadena County, Minnesota, owned by the Boyers. The listing price was

---

1. Wendy Boyer made no appearance at trial.

$285.00 per acre, for a total price of $628,-140.00. The terms of the purchase were "to be negotiated approx.—29% down." The contract called for a commission of 6% to be paid to Allied to find a "ready and willing" buyer.

The Hoffmeisters made an inquiry concerning the land in April 1976 and negotiations between Allied's salesman, M. E. Pederson, and the Hoffmeisters resulted in a sale of the 2,204-acre parcel by a contract for deed for the listed price of $628,140.00. The terms of the agreement provided for a down payment of $125,000 due on 1 Nov 1976 with the balance of $503,140.00 to be paid in annual payments of $25,000.00 plus interest commencing in May 1977. As security for the $125,000.00 down payment, the Boyers received a second mortgage on "Sundown Ranch" which was then owned by the parents of the Hoffmeisters. The "Sundown Ranch" was located approximately 6 to 8 miles from the Boyers' land in Wadena County and contained 604 acres of land comparable in per-acre value to the Boyers' land. The second mortgage was subject to a first mortgage of approximately $35,000.00 held by the Viroqua State Bank of Viroqua, Wisconsin.

A settlement statement, dated 24 May 1976, reflects a $35,000.00 sales commission owed to Allied by the Boyers. The Boyers executed a promissory note, dated 1 July 1976, at the request of Allied for the sales commission. The terms of the promissory note provided that the Boyers agreed to pay to Allied the sum of $35,000.00, plus interest at the rate of 7% per annum, with payments of $20,000.00 on 1 Dec 1976, $10,000.00 on 1 June 1977, and the balance due on 1 June 1978.

The Hoffmeisters defaulted on the contract for deed, and as a result, the Boyers cancelled the contract for deed and foreclosed on the second mortgage on "Sundown Ranch." The Boyers ended up owning their original land and the "Sundown Ranch" subject to the first mortgage.

The Boyers did not make any payments on the promissory note, and Allied instituted this lawsuit for recovery on the promissory note. The Boyers' answer to the action on the promissory note asserted the affirmative defense of a failure of consideration in that Allied failed to produce a ready, willing, and able buyer for the 2,204-acre tract of land.

The district court found that the inquiry by Allied salesman, M. E. Pederson, into the financial ability and condition of the Hoffmeisters was not adequate, and that the Hoffmeisters were not ready, willing and financially able buyers at the time the contract for deed was entered into. Notwithstanding this finding, the district court also found that the Boyers had received a financial benefit in the form of the second mortgage on "Sundown Ranch" and that the second mortgage had a value to the Boyers of $125,000.00. Thus, the district court determined that Allied was entitled to a commission at the agreed-upon rate of 6% on the $125,000.00 financial benefit received by the Boyers. The district court entered a judgment of $7,500.00, plus costs of $160.05, in favor of Allied, and Allied, believing it was inadequate, appealed from that judgment.

The first question for our review concerns whether or not failure of consideration, either total or partial, is a defense in the suit on the promissory note. Allied asserts that the transactions were "closed" on 24 May 1976 (the date of the settlement statement), and the Boyers became liable for the sales commission at that time. Thus, Allied contends that no consideration was needed for the promissory note because the note was given as security for an antecedent obligation. See § 41–03–45, North Dakota Century Code.

The Boyers assert that because Allied did not procure a financially able buyer, the sales commission was not earned and the note was not given as security for an antecedent obligation. Therefore, the Boyers contend there was a failure of consideration which is a valid defense to the promissory note. See § 41–03–45, NDCC.

These interrelated questions hinge on a determination of when, if ever, the Boyers became obligated to Allied for the sales commission.

In *Goetz v. Anderson,* 274 N.W.2d 175 (N.D.1978), we addressed the question of when a real estate broker was entitled to a commission. In *Goetz, supra* at 182–183, we concluded by saying:

"In summary, the procuring of a prospective purchaser under an exclusive listing agreement implies the production of a ready, willing, and financially able purchaser[2] The financial condition refers to the requirement at the time of closing the transaction of either having the funds to make the payment or be in a position to arrange for the necessary financing to pay for the property to be purchased, but does not refer to subsequent developments. It therefore follows that for a real estate broker to be entitled to a commission pursuant to an exclusive listing agreement he must produce a prospective ready, willing and financially able purchaser of the property. It also follows that if the seller rejects the purchaser, evidence must be introduced to establish that the seller's refusal to consummate the sale was arbitrary, capricious, unreasonable, or wrongful and was not for good cause." [Footnote ours.]

We also observed that the broker had the obligation to inquire into the prospective buyer's financial status to establish his adequacy to fulfill the monetary conditions of the purchase. *Goetz, supra* at 180.

In *Goetz, supra* at 181, we also quoted with approval from *Shell Oil Co. v. Kapler,* 235 Minn. 292, 50 N.W.2d 707 (1951), the following rules for determining whether or not the purchaser had the financial ability to buy:

"Rules for testing a purchaser's financial ability to buy are not to be reduced to any unyielding formula, but must be flexible enough to accomplish their purpose according to the particular facts of each case. In ascertaining the rules reflected by an endless variety of cases it is particularly important to bear in mind that no

decision is authoritative beyond the scope of its controlling facts. Difficulty in both stating and applying the rules stems principally from a failure to keep in mind *their purpose*—the protection of good-faith sellers as well as of bona fide purchasers, brokers, and other persons similarly *situated—is to establish a purchaser's financial ability to buy with reasonable certainty.* A purchaser may not have the necessary cash in hand, but that alone, it is recognized, does not disqualify him if he is otherwise so situated that he is reasonably able to *command the requisite cash at the required time.* On the other hand, the seller is not required to part with his property to a purchaser whose financial ability rests upon nothing more than shoestring speculation or upon attractive probabilities which fall short of reasonable certainty. In short, the rules are designed to protect the seller by binding him to a sale only where there is a reasonable certainty of the purchaser's financial ability to pay and, on the other hand, to protect the purchaser—and persons similarly situated—from a technical, insubstantial, or sharp-dealing disqualification.

"Generally speaking, a purchaser is financially ready and able to buy: (1) If he has the needed cash in hand, or (2) if he is personally possessed of assets—which in part may consist of the property to be purchased—and a credit rating which enables him with reasonable certainty to command the requisite funds at the required time, or (3), if he has definitely arranged to raise the necessary money— or as much thereof as he is unable to supply personally—by obtaining a *binding commitment* for a loan to him for that purpose *by a financially able third party,* irrespective of whether such loan be secured in part by the property to be purchased." [Emphasis in original.]

**2.** We note that the listing agreement in *Goetz,* as in the present case, excluded the word "able" from the traditional description of a buyer which a broker is required to produce to earn his commission. However, in *Goetz* this

exclusion did not relieve the broker of his duty to produce a buyer capable of purchasing upon the terms specified by the seller and, in this instance, the exclusion of the word "able" does not relieve Allied of its duty.

Allied contends that the Hoffmeisters qualified as a financially able buyer under two of these criteria. We disagree. Allied asserts that the Hoffmeisters satisfied the third criteria because they had obtained a second mortgage on "Sundown Ranch" from their parents. Allied also contends that the Hoffmeisters satisfied the second criteria because they removed a "substantial" hay crop from the Boyers land in 1976.

The second mortgage on Sundown Ranch was security for the down payment only. There was no evidence introduced to indicate that the Hoffmeisters had obtained a binding commitment or loan for the remainder of the payments which would be due under the contract.

Although the income-producing capabilities of the property to be purchased is an asset which may be relevant to the financial ability of the buyer, that factor alone does not always make the buyer financially able, especially if the income is of a speculative nature, such as a hay crop which is dependent upon rain and weather conditions. In situations such as this, the prospective buyer's credit rating must also be considered to determine with reasonable certainty whether or not the buyer can command the requisite funds to make payments at the required time.

M. E. Pederson testified as follows concerning the scope of Allied's inquiry into the Hoffmeisters' financial ability to buy the Boyers land:

"Q. Did they [Hoffmeisters] ever demonstrate to you by financial statement or other concrete evidence that they had the financial backing to really put together their plan?

"MR. MILLER: Objection, irrelevant.

"THE COURT: He may answer, court case.

"THE WITNESS: No, this—if you will notice between the difference between the purchase order and the closing statement, they're within their—the contract for deed, they were, I believe, within 20 to 30 days of each other. In the meantime, I did through the phone because there wouldn't have been time by the mails, called one banker and an attorney in—on the southern slopes of Colorado—I forget the town right off hand, to inquire about the Hoffmeisters. I also called a bank and a store keeper in some town in eastern Colorado and one also in western Nebraska and got real good sendoff on them, which turned out later to be nothing but a pack of lies.

"Q. Really, Dan and Ryan didn't have much to back them up personally, did they?

"A. No, neither did the father."

The record does not reflect who Pederson called in Nebraska or Colorado, nor does it reflect any attempt to verify the information received by Pederson.

In this instance we conclude that the trial court's finding that Allied did not satisfy its obligation to produce a financially able buyer is not clearly erroneous. Rule 52(a), North Dakota Rules of Civil Procedure.

Allied contends that an affirmance of the district court will make realtors the insurer of every payment on a contract for deed. We disagree. Initially, we note that *Goetz, supra* at 177 also involved a contract for deed. Furthermore, *Goetz* does not make the realtor a guarantor, but rather requires the realtor to produce a ready, willing, and financially able buyer. The buyer must be financially able at the time the transaction is closed. This includes the ability to make the down payment and complete the contract according to its terms. Subsequent developments are not considered in determining if a ready, willing, and financially able buyer was produced and thus are irrelevant.

Because Allied did not produce a ready, willing, and financially able buyer, they were not entitled to the sales commission, and, therefore, there was not an antecedent obligation owed to Allied by the Boyers at the time the promissory note was executed. Accordingly, failure of consideration is a defense to the promissory note.

Technically, Allied's failure to produce a ready, willing, and financially able buyer

does not entitle them to any commission on the exclusive listing contract entered into between Boyer and Allied. However, this is not the final solution to the legal situation before us.

Notwithstanding the fact that Allied did not provide a ready, willing, and financially able buyer, the district court awarded Allied $7,500.00. This award was based on a 6% commission for the fair market value of the mortgage on the "Sundown Ranch" which was foreclosed by the Boyers.

The Boyers have requested this Court to modify the judgment of the trial court so as to award no real estate commission or judgment to Allied. However, this request was not presented to this Court in the form of a cross-appeal and has not been briefed or argued to any extent. Because of our holding affirming the trial court's finding that the Hoffmeisters were not financially able buyers, we believe some appropriate observations on the propriety of this award should be made.

 Allied's cause of action was based entirely on the promissory note but Boyer's answer expanded the issues to include the attending obligation to produce a ready, willing, and financially able buyer. However, the evidence presented establishes that, although Allied did not satisfy the terms of the exclusive listing agreement, they did perform some services for Boyers which led to the foreclosure on the second mortgage on "Sundown Ranch" which was obtained by Allied for Boyer as security for the down payment of the land transaction. Furthermore, the testimony reflects that Boyer received some value for these services performed by Allied. We believe, in this instance, a recovery upon quantum meruit for the reasonable value of the services rendered by Allied is justified. *Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.*, 87 Ill.App.3d 480, 42 Ill.Dec. 360, 408 N.E.2d 1069 (1980); *Nardi & Co., Inc. v. Allabastro*, 20 Ill.App.3d 323, 314 N.E.2d 367 (1974); *Bangle v. Holland Realty Investment Co.*, 80 Nev. 331, 393 P.2d 138 (1974).

The testimony reflects several possible amounts for the value of the services performed by Allied. In this instance the recovery allowed by the district court is within the range of these values and we conclude that it is not unreasonable.

We believe the award is also compatible with the equitable principle of unjust enrichment. See *A & A Metal Buildings v. I–S, Inc.*, 274 N.W.2d 183 (N.D.1978).

Both parties have requested that they be awarded their costs on this appeal. Because we have affirmed the trial court's decision, the costs of this appeal shall be taxed against the appellant, Allied. Rule 39, North Dakota Rules of Appellate Procedure.

For reasons stated in this opinion, the decision of the district court is affirmed.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.